EXHIBIT

B

**ST. LOUIS POST-DISPATCH**

# Statement of St. Louis Prosecuting Attorney Robert P. McCulloch

NOVEMBER 24, 2014 8:15 PM • BY JEREMY KOHLER

To follow is a transcript of the statements by St. Louis County Prosecuting Attorney Robert P. McCulloch on Monday night as he announced the decision of the grand jury not to indict Darren Wilson.

*First and foremost, I would like to extend my deepest sympathies to the family of Michael Brown. As I have said in the past, I know that regardless of the circumstances here, they lost a loved one to violence. I know the pain that accompanies such a loss knows no bounds.*

*On August 9, Michael Brown was shot and killed by police officer Darren Wilson. Within minutes, various accounts of the incident began appearing on social media. The town was filled with speculation and little if any solid accurate information. Almost immediately, anger began brewing because of the various descriptions of what had happened and because of the underlying tensions between the police department and a significant part of the neighborhood. The St. Louis county police conducted an extensive investigation of the crime scene. Under varying trying circumstances and interrupted at least once by gunfire. Continuing after that, they, along with the agents of the FBI at the direction of Attorney General Eric Holder, located numerous individuals and gathered additional evidence and information.*

*Fully aware of the unfounded but growing concern in some parts of our community that the investigation and review of this tragic death might not be fair, I decided immediately that all of the physical evidence gathered, all people claiming to have witnessed any part or all of the shooting, and any and all other related matters would be presented to the grand jury.: 12 members of this community selected by a judge in May of this year long before the shooting occurred.*

*I would like to briefly expand upon the unprecedented cooperation of the local and federal authorities. When Attorney General Holder first announced the investigation just days after the shooting, he pledged that federal investigators would be working with local authorities as closely as possible every step of the way and would follow the facts wherever it may take us. We both pledged our separate investigations will follow the trail of facts with no preconceived notion of where that journey would take us. The only goal was that our investigation would be thorough and complete to give the grand jury, the Department of Justice and ultimately, the public all available evidence to make an informed decision.*

*All evidence obtained by federal authorities was immediately shared with St. Louis county investigators. All evidence gathered by St. Louis county police was immediately shared with the federal investigators. Additionally, the Department of Justice conducted its own*

examination of evidence and performed its own autopsy. Another autopsy was performed at request of the Brown family and his information was also shared. Just as importantly, all testimony before the St. Louis county grand jury was immediately provided to the Department of Justice.

Although the investigations are separate, both of the local and federal government have all of the same information and evidence. Our investigation and presentation of the evidence of the grand jury and St. Louis county has been completed.

The most significant challenge encountered in this investigation has been the 24-hour news cycle and the sensational appetite for something to talk about. Following closely behind were the rumors on social media.

I recognize the lack of accurate detail surrounding the shooting frustrates the media and the general public and helps breed suspicion among those already stressed out by the system.

The most closely-guarded details give law enforcement a yardstick for measure the truthfulness of what people said. Eyewitness accounts must always be challenged and compared against the physical evidence. Many witnesses to the shooting of Michael Brown made statements inconsistent with other statements they made and also conflicted with the physical evidence. Some were completely refuted by the physical evidence.

An example -- before the result of an autopsy was released, witnesses claim they saw Officer Wilson stand over Michael Brown and fire many rounds into his back. Others claim that Officer Wilson shot Mr. Brown in the back as Mr. Brown was running away. However, once the autopsy findings were released showing Michael Brown had not sustained any wounds to the back of his body, no additional witnesses made such a claim. Several witnesses adjusted their stories in their subsequent statements.

Some even admitted they did not witness the event at all but merely repeated what they heard in the neighborhood or assumed. Fortunately for the integrity of our investigation, almost all of initial witness interviews, including those of Officer Wilson, were recorded. The statements in the testimony of most of the witnesses were presented to the grand jury before the autopsy results were released by the media, and before several media outlets published information from reports they received from a D.C. Government official.

The jurors were therefore , prior to the release of the information being public and what followed in the new cycle -- the jurors were able to assess the credibility of the witnesses, including those witnesses who statements and testimony remained consistent throughout every interview and were consistent with the physical evidence.

My assistants began presenting to the grand jury on August 23. The evidence was presented in an organized and orderly manner. The jurors gave us a schedule of when they could meet. All 12 jurors were present for every session and heard every word of testimony and examined every item of evidence.

Beginning August 20 and continuing until today, the grand jury worked tirelessly to examine and re-examine all of the testimony of the witnesses and all of the physical evidence. They were extremely engaged in the process asking questions of every witness,

*requesting specific witnesses, requesting specific information and asking for certain physical evidence. They met on 25 separate days in the last three months, heard more than 70 hours of testimony from about 60 witnesses and reviewed hours and hours of recordings of media and law enforcement interviews by many of the witnesses who testified. They heard from the three medical examiners and experts on blood, DNA, toxicology, firearms and drug analysis. They examined hundreds of photographs, some of which they asked to be taken. They examined various pieces of physical evidence. They were presented with five indictments ranging from murder in the first degree to involuntary manslaughter. Their burden was to determine, based upon all of the evidence, if probable cause existed to believe that a crime was committed and that Darren Wilson was the person to commit the crime.*

*There is no question that Darren Wilson caused the death of Michael Brown by shooting him, but the inquiry does not end there. The law authorizes a law enforcement officer to use deadly force in certain situations. The law allows all people to use deadly force to defend themselves in certain situations. The grand jury considered whether Wilson was the initial aggressor in this case, or whether there was probable cause to believe that Darren Wilson was authorized as a law enforcement officer to use deadly force in this situation, or if he acted in self-defense.*

*I detail this for two reasons: First, so that everybody will know that, as promised by me and Attorney General Holder, there was a full presentation of all evidence and appropriate instruction in the law to the grand jury. Second, as a caution to those in and out of the media who will pounce on a single sentence or witness and decide what should have happened in this case based on that tiny bit of information.*

*The duty of the grand jury is to separate fact from fiction, after a full and impartial examination of all the evidence involved, and decide if evidence supported the filing of any criminal charges against Darren Wilson. They accepted and completed this monumental responsibility in a conscientious and expeditious manner.*

*It is important to note here, and say again, that they are the only people, the only people who have heard and examined every witness and every piece of evidence. They discussed and debated the evidence among themselves before arriving at their collective decision. After their exhaustive review, the grand jury deliberated and made their final decision. They determined that no probable cause exists to file any charges against Officer Wilson and returned a "no true bill" on each of the five indictments.*

*The physical and scientific evidence examined by the grand jury, combined with the witness statements, supported and substantiated by that physical evidence, tells the accurate and tragic story of what happened.*

*The very general synopsis of the testimony and the physical evidence presented to the grand jury follows -- as I have promised, the evidence presented to the grand jury, with some exceptions, and the testimony of the witnesses called to the grand jury will be released at the conclusion of this statement.*

*At approximately 11:45 a.m. on Saturday, the ninth of August, Ferguson police officer Darren Wilson was dispatched to the Northwinds apartment complex for an emergency*

involving a two-month-old infant having trouble breathing. At approximately 11:53 a.m., while still at the Northwinds call, Wilson heard a radio broadcast of stealing in progress at a market on West Florissant. The broadcast included a brief description of the suspect: a black male, wearing a white t-shirt, who took a box of Swisher cigars. Officer Wilson remained with the mother and the infant until EMS arrived. Officer Wilson left the apartment complex in his police vehicle, a Chevy Tahoe SUV, and drove west on Canfield towards West Florissant. An additional description of the suspect was released at that time: wearing a red hat, yellow socks and khaki shorts, and he was with another male.

As Officer Wilson was attending to his emergency call, Michael Brown and a companion were in the local convenience store. Michael Brown's activity in the store was recorded by the store security cameras. The video, often played following its release in August by the Ferguson police department, shows Michael Brown grabbing a handful of cigarillos and heading toward the exit without paying. As Michael Brown and his companion left the store, someone inside the store called the police.

After crossing West Florissant, the the two walked east on Canfield in the middle of the street, Mr. Brown directly behind his companion. As Officer Wilson continued west on Canfield, he encountered Mr. Brown and his companions walking in the middle of the street. As Wilson slowed or stopped, he told them to move to the sidewalk. Words were exchanged and they continued to walk down the middle of the street.

Wilson observed that Michael Brown had cigarillos in his hand and was wearing a red hat. At approximately 12:02 p.m., Wilson radioed he had to individuals on Canfield and needed assistance. Officer Wilson backed his vehicle at an angle blocking their path and blocking the flow of traffic in both directions. Several cars approached from both east and west but weren't able to pass the vehicle.

An altercation took place with Officer Wilson seated inside the vehicle and Mr. Brown standing at the drivers window. During the altercation, two shots were fired by Officer Wilson while still inside the vehicle. Mr. Brown ran east and Officer Wilson gave chase. Near the corner of Canfield and Coppercreek, Mr. Brown stopped and turned back to Officer Wilson. Officer Wilson also stopped. As Michael Brown moved towards Officer Wilson, several more shots were fired by the officer and Michael Brown was fatally wounded.

Within seconds of the final shot, the assist car arrived. Less than 90 seconds passed between the first contact and the arrival of the assist car.

During the investigation, eyewitnesses were interviewed by media -- by various news outlets. Witnesses were interviewed by local and federal law enforcement, sometimes together and sometimes separately. All the statements were provided to the other party. All previous statements of witnesses who testified before the grand jury for also presented to the grand jury whether they were media interviews or interviews by the FBI or by the county police department.

The statements of all witnesses, civilian, law-enforcement, and experts were challenged in court by other law enforcement, by the prosecutors and the grand jury themselves. A common and highly effective method for challenging a statement is to compare it to the

*previous statements of the witness for consistency and to compare it with the physical evidence.*

*The physical evidence does not change because of public pressure or personal agenda. Physical evidence does not look away as events unfold nor does it blackout or add to memory. It remains constant and is a solid foundation upon which cases are built.*

*When statements changed, witnesses were confronted with the inconsistencies and conflict between their statements and the physical evidence. Some witnesses admitted they did not actually see the shooting or only saw part of the shooting, only repeating what they heard on the street. Some others adjusted parts of their statements to fit the facts. Others stood by original statements even though their statements were completely discredited by the physical evidence. Several witnesses describe seeing an altercation in the car between Mr. Brown and Officer Wilson. It was described as wrestling, tug-of-war. Several other witnesses described Mr. Brown as punching Officer Wilson while Mr. Brown was partially inside the vehicle. Many of the witnesses said they heard a gunshot while Mr. Brown was still partially inside the vehicle. At least one witness said that no part of Mr. Brown was ever inside the vehicle and that the shot was fired through an open window while Mr. Brown was standing outside.*

*The vehicle, and Officer Wilson's clothing and equipment, was examined by various technicians and scientists. Mr. Brown's blood and/or DNA were located on the outside of the driver's door. His blood and DNA were found on the outside of the left rear passenger door. Mr. Brown's blood and DNA was found on the inside of the driver's door, the upper left thigh of Officer Wilson's pant leg, the front collar of Officer Wilson's shirt, and on Officer Wilson's weapon. Additionally, a bullet fired from Officer Wilson's weapon was located inside the driver's door. The shot was fired from inside the vehicle striking the door in a downward angle at the armrest. The second bullet was not recovered.*

*Regarding the gunshot wounds of Mr. Brown, it should be noted that three separate autopsies were conducted -- one by the St. Louis county medical office, one by a private pathologist, and one by the Department of Defense. The result of all three autopsies were consistent with one another in all significant respects. Mr. Brown had a gunshot graze wound on his right hand, on his right thumb. The path of that bullet was away from the tip of the hand. Soot consistent with a close range gunshot was present in that wound. Officer Wilson also had a medical examination which indicated some swelling and redness to his face.*

*Almost all witnesses stated that after they heard the shots fired while Mr. Brown was at the car, he hesitated and then ran east. Most stated that, almost immediately, Officer Wilson got out of his vehicle and chased after him. Some witnesses stated Wilson fired at Mr. Brown as he chased after him, striking him. At least -- at least one witness said one of the shots struck Mr. Brown. Others stated he did not fire until Mr. Brown turned and came back towards the officer.*

*At least one witness stated that, as Officer Wilson got out of his vehicle, he shot Mr. Brown multiple times as Mr. Brown stood next to the vehicle. Yet another witness stated that Officer Wilson stuck his gun outside the window and fired at Mr. Brown as Mr. Brown was running. One witness stated there was actually two police vehicles.*

*Most witnesses agreed that near the corner of Canfield and Coppercreek, Mr. Brown stopped and turned around, facing Officer Wilson. Some said Mr. Brown did not move towards Officer Wilson at all, but was shot multiple times as he stood near the corner with his hands raised. In subsequent interviews with law enforcement or other testimony before the grand jury, many of the same witnesses said they did not actually see the shooting. Some were running for cover, some were relating what they heard from others or they said what they assumed happened in that case.*

*Several other witnesses maintained their original statement that Mr. Brown had his hands in the air and was not moving towards the officer when he was shot. Others said he was shot -- excuse me -- several witnesses stated that Mr. Brown did not raise his hands at all or that he raised them briefly and then dropped them and turned towards Officer Wilson, who fired several rounds. Other witnesses stated Mr. Brown stopped for a very brief period and move towards Officer Wilson again. One describes his movement as a "full charge."*

*According to some witnesses, Officer Wilson stopped firing when Mr. Brown stopped moving towards him, and resumed firing when Mr. Brown started moving towards him again. These witnesses did not make any statements to the media.*

*The description of how Mr. Brown hands, raised his hands, or the position of his hands, is not consistent among the witnesses. Some describe his hands as being out to his sides, some said in front of him with palms up, others said his hands were raised by his head or by his shoulders. Still others describe his hands is being in a running position or in fists.*

*There are also various witness statements regarding Mr. Brown's movements after he stopped and turned back towards Officer Wilson. Several witnesses said Mr. Brown never moved towards Officer Wilson when he was shot. Most said the shots were fired as he moved towards Wilson. Mr. Brown's movements were described as "walking," "moving fast," "stumbling" or "full charge." The varying descriptions were sometimes provided by the same witnesses in subsequent statements for testimony.*

*The entire area was processed by the St. Louis county crime scene unit. A total of 12 rounds were fired by Officer Wilson. Two shot at the car, 10 more farther east.*

*Mr. Brown sustained a graze wound to his thumb while standing next to the vehicle. He sustained six or seven more gunshot wounds, depending upon whether one of the shots was an entry or reentry wound. Mr. Brown sustained a second graze wound, another graze wound, to his right bicep. He also sustained wounds to his right forearm, upper front right arm, lateral right chest, upper right chest, forehead and top of the head.*

*The top of the head, forehead, and perhaps the upper right chest, were consistent with his body being bent forward at the waist. Except for the first and last wound, the medical examiners were unable to determine the order of the shots. The graze wound of the thumb sustained at the vehicle was likely the first wound. It was the only close range shot. The shot at the top of the head was most likely the last. It would've rendered him immediately unconscious and incapacitated.*

*Mr. Brown's body was located approximately 153 feet east of Officer Wilson's car. Mr.*

*Brown's blood was located approximately 25 feet farther east past his body. And a nearby tenant during a video chat inadvertently captured the final ten shots -- 10 shots on tape. There was a string of shots, followed by a brief pause, and then another string of shots.*

*As I stated earlier, the evidence and the testimony will be released following the statement.*

*I am ever mindful that this decision will not be accepted by some and may cause disappointment for others. All decisions in the criminal justice system must be determined by the physical and scientific evidence, and the credible testimony corroborated by that evidence, not in response to public outcry. Decisions on a matter as serious as charging an individual with a crime cannot be decided on anything less than complete examination of all available evidence. Anything less is not justice. It is my sworn duty and that of the grand jury to seek justice, and not simply obtain an indictment or conviction.*

*I do want to say that, during this extremely tense and painful time that we have, the citizens of this community should be, and are, very mindful of the fact that the whole world is watching, and watching how we respond and how we react. I would urge each and every one of them, with the loss of that was suffered by the Brown family, no young man should ever die.*

*This is a loss of life, and it is a tragic loss, regardless of the circumstances. But it opens old wounds and gives us an opportunity now to address those wounds, as opposed to in the past, where they just fade away.*

*How many years we have talked about the issues of that lead to incidents like this? And yet, after a period of time, it just fades away. I urge everyone who was engaged in the conversation, who was engaged in the demonstrations, to keep that going. Not to let that go. And to do it in a constructive way, a way we can profit from this. A way that we can benefit from this, by changing the structure, and changing some of the issues, by solving the issues that lead to these sorts of things.*

*I join with Michael Brown's family, and with the clergy, and with anyone and everyone else; the NAACP, the Urban League, and every government official, and private citizen that you've heard encouraging everyone to continue the demonstrations, continue the discussion, address the problems, but do so in a constructive way, not in a destructive way.*